*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HARRIS/RODGERS/WILLIAMS, Minors.

UNPUBLISHED
April 10, 2026
10:00 AM

No. 376675
Wayne Circuit Court
Family Division
LC No. 2024-000676-NA

Before: KOROBKIN, P.J., and YOUNG and BAZZI, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to three minor children, CJR, CJW, and CTH. On appeal, respondent argues that petitioner, the Michigan Department of Health and Human Services (DHHS), failed to reasonably accommodate her disabilities in its provision of services under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.* Respondent further contends that the trial court erred when it found by clear and convincing evidence statutory grounds for termination pursuant to MCL 712A.19b(3)(a)(*ii*) (parent deserted child for 91 or more days), MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist and are not likely to be rectified), and MCL 712A.19b(3)(j) (reasonable likelihood child will be harmed if returned to home of parent). Respondent lastly challenges the trial court's determination that the termination of her parental rights was in the best interests of her minor children. We disagree and affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Respondent and her three children[1] were living with M. Jones[2] until the end of September 2023, when respondent moved out and left her children behind. M. Jones was under the impression respondent would return for the children, but by late December 2023, respondent had yet to do so.

---

[1] None of the three children have a legal father. A putative father for CJW was identified at the termination hearing, but he did not undergo DNA testing to establish paternity.

[2] M. Jones is fictive kin.

Child Protective Services (CPS) was subsequently contacted regarding respondent's physical neglect of the children. Respondent had not initiated contact to check on the children and rarely responded to attempts to contact her. Respondent did not assist with the children's care. Specifically, she did not provide financial or material support, consent for medical treatment, or consent for educational enrollment. She did not attend or assist with birthday celebrations for CTH or CJR. When CPS specialist, Quinesha Boykins, spoke with her, respondent stated she left the children with M. Jones because she did not have a home, and admitted she had not contacted the children.

The trial court authorized DHHS's petition to remove the children from respondent's care in April 2024 and ordered parenting time be supervised by DHHS or its designee. In May 2024, the court took jurisdiction over the children and adopted a parent-agency treatment plan (PATP). The PATP required respondent to undergo a psychological evaluation and complete all recommended follow-up. She was to participate in individual counseling and infant mental health services, in addition to family therapy when CJR's and CJW's therapists deemed it appropriate. Respondent was further required to maintain a legal source of income, acquire suitable housing, and maintain contact with caseworkers. Respondent was additionally mandated to attend court hearings, parenting time sessions, and medical appointments. Lastly, respondent was to sign any necessary releases. The trial court also advised the foster care worker, Porschia Lee, to supervise at least two parenting time sessions before the next court date.

By the initial dispositional review hearing respondent admitted to Lee her first three parenting time sessions were supervised but all others were unsupervised and apologized for violating the court's order. Respondent was additionally having difficulties with the infant mental health schedule, but the court noted respondent was making progress with her PATP. Respondent continued to progress through the next hearing but lost her employment and was facing eviction. She consistently attended supervised parenting time and parenting classes. DHHS recommended permitting overnight parenting time at the agency's discretion, and the trial court agreed.

Respondent's progress stalled before the third dispositional review hearing in December 2024, which she did not attend. Respondent posted Facebook Live videos during her November birthday celebration, which coincided with a parenting time session, and exhibited "concerning behaviors." The videos prompted DHHS to move parenting time back to the agency under supervision. Respondent had not attended parenting time since this change. The cited videos depicted respondent drinking, smoking marijuana, and using offensive language while the children were present. In one video, respondent described having been "drunk as hell" at the club, presumably the night before, while a child yelled for her attention because another child had an accident on the bed. DHHS opined respondent was "not really parenting" and was "basically ignoring" the children. Respondent successfully completed her parenting classes, but the court found she had not benefited from them and ordered additional classes. The provider offered one-on-one sessions. Respondent was further terminated from individual counseling for lack of cooperation, failed to complete her psychological evaluation, stopped responding to Lee, and was evicted.

By February 2025, respondent had not attended a parenting time session since the November 2024 birthday incident. In total, she missed 27 of 45 sessions. However, respondent participated in the psychological evaluation, which provided a diagnosis of various mental health

disorders. DHHS filed a supplemental petition requesting termination of respondent's parental rights under MCL 712A.19b(3)(a)(*ii*), MCL 712A.19b(3)(c)(*i*), MCL 712A.19b(3)(g), and MCL 712A.19b(3)(j). Respondent attended the hearing regarding the supplemental petition, at which the trial court explained to respondent what was expected of her to avoid termination.

Respondent did not appear for the pretermination or termination hearings. By this time, she had seven referrals for individual therapy which she never completed. Respondent was previously prescribed medication for her mental health disorders but she refused to resume medication. Because of those diagnoses, Lee referred respondent to the Neighborhood Service Organization (NSO), which is for individuals with disabilities, and Detroit-Wayne Integrated Health Network (DWN). When Lee attempted to assist respondent with completing the intake process with DWN, respondent "had an emotional meltdown" and informed Lee, "She don't have no time for this f*****g s**t." Respondent's evaluation also indicated she had "low—extremely low" intelligence quotient (IQ) scores, although Lee found her to be "smart," "resourceful," and "resilient." Respondent was able to complete most applications independently, but Lee helped her with certain documents.

Respondent attended 6 of the 21 additional parenting classes, which were terminated because the provider could not locate her. Lee believed respondent was unhoused and unemployed on the date of the termination hearing. Lee estimated respondent's employment typically lasted approximately four to six weeks. Even when employed, respondent never provided financial resources or clothing for the children, but she brought snacks to two parenting time sessions. Respondent rarely attended educational or medical appointments for the children despite Lee's offer to provide transportation.

During the termination hearing, the trial court opined "because a parent is not able to complete a treatment plan or benefit from the treatment plan, that doesn't mean they're automatically disabled" such that *In re Hicks/Brown*, 500 Mich 79; 893 NW2d 637 (2017) was applicable. Rather, the court found DHHS made proper referrals and respondent refused to complete or participate in the services offered. The trial court further determined that statutory grounds MCL 712A.19b(3)(a)(*ii*), MCL 712A.19b(3)(c)(*i*), and MCL 712A.19b(3)(j), were established by clear and convincing evidence. The court concluded termination of respondent's parental rights was in the best interests of the minor children. This appeal ensued.

## II. ANALYSIS

### A. REASONABLE EFFORTS

"In order to preserve an argument that petitioner failed to provide 'adequate services,' the respondent must 'object or indicate that the services provided to them were somehow inadequate' " when the court adopts a service plan or soon after. *In re Atchley*, 341 Mich App 332, 336; 990 NW2d 685 (2022). However, a challenge raised later in the proceedings may also be timely because "services that are adequate at the beginning of the case may become inadequate as the case proceeds," and a petitioner may have to adapt to a respondent's changing needs. *Id*. at 337. In this case, the treatment plan was adopted in May 2024, but respondent's potential ADA eligibility was not discovered until January 2025 after she completed a psychological evaluation. Respondent did not object to the treatment plan before the May 2025 termination hearing despite

-3-

having at least two prior hearings. The issue was raised for the first time at the termination hearing and the trial court opined that *In re Hicks/Brown* was inapplicable. Respondent's counsel argued in closing that "it's quite clear through the record, that [respondent] had a disability that was also an emotional disfunction disability." Because respondent waited to object to her PATP or indicate the services were inadequate until the termination hearing, the issue is unpreserved.

A trial court's decision regarding reasonable efforts is reviewed for clear error. *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021). A trial court's application or interpretation of a statute is reviewed de novo. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). Unpreserved claims of error "are reviewed for 'plain error affecting substantial rights.' " *Id*., quoting *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). Under the plain-error standard, a party may avoid forfeiture of an issue if a plain, clear, or obvious error affected a litigant's substantial rights, i.e., "the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

"Title II of the ADA requires that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity.' " *In re Hicks/Brown*, 500 Mich at 86, quoting 42 USC 12132. A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 USC 12102(1). Major life activities include "learning, reading, concentrating, thinking, communicating, and working." 42 USC 12102(2). DHHS is required to "make 'reasonable modifications in the policies, practice, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.' " *In re Hicks/Brown*, 500 Mich at 86, quoting 28 CFR 35.130(b)(7) (2016). "The Department, of course, cannot accommodate a disability of which it is unaware." *In re Hicks/Brown*, 500 Mich at 87. Once DHHS is aware of the disability, it has an affirmative duty to make reasonable efforts toward reunification. *Id*. at 87-88. Reunification-oriented services "typically include drug treatment, psychological evaluation and support, and housing assistance." *In re Simonetta*, 340 Mich App 700, 707; 987 NW2d 919 (2022). "When challenging the services offered, a respondent must establish that he or she would have fared better if other services had been offered." *In re Sanborn*, 337 Mich App at 264.

*In re Sanborn*, 337 Mich App 252, involved a respondent-mother's challenge to DHHS's provision of services to accommodate her intellectual disability. In that case, DHHS offered foster care case management, individual therapy, infant mental health referrals, psychological evaluations, parenting skill training, housing assistance, transportation assistance, and supervised parenting time with the child. *Id*. at 264. The respondent-mother's psychological evaluation indicated she might be intellectually disabled and caseworkers were aware of this from a previous termination. *Id*. at 264-265. Services to accommodate the respondent-mother's intellectual disability were recommended, but DHHS changed the goal from reunification to termination because "[the respondent-mother] had stopped discussing her progress with the DHHS caseworker" and refused to work with the caseworker on several occasions. *Id*. at 265. Even before the psychological evaluation, DHHS had provided services "designed to provide [the respondent-mother] 'repeated exposure,' something [the doctor] testified was appropriate for someone with an intellectual disability to receive." *Id*. Despite the repeated exposure, the respondent-mother was still unable to properly care for her child. *Id*. Further, the respondent-

mother failed to identify "any service that she believes would have benefitted her more than the services that were actually provided." *Id*. As a result, this Court was "left to speculate what other services the DHHS *could* have offered." *Id*. at 266. This Court opined the respondent-mother's failure to identify what services would have appropriately accommodated her disability did not establish a plain error affecting her substantial rights had occurred. *Id*. at 267.

Respondent asserts, "The ADA must be implemented if the parent is disable [sic]. The low IQ and mental health illness are disabilities." Respondent's psychological evaluation provided that she was diagnosed with "bi-polar order unspecified, and major depressive order, the severe type," and her IQ score was 60 to 70, which was in the "extremely low range." The trial court questioned whether *In re Hicks/Brown* was applicable to respondent's matter because "there's no testimony that she was ever in special education, was under an [IEP][3] at school. She graduated from 11th grade in high school and because parent is not able to complete treatment plan or benefit from the treatment plan, that doesn't mean they're automatically disabled." However, *In re Hicks/Brown*, 500 Mich at 86-88, does not impose a heightened evidentiary burden on a respondent-parent to establish a disability in order to obtain reasonable modifications to services or programs under the ADA. Rather, the Michigan Supreme Court explained, "Once the Department knew of the disability, its affirmative duty to make reasonable efforts at reunification meant that it could not be passive in [its] approach...as far as the provision of accommodations is concerned." *Id*. at 87-88 (alteration in original; quotation marks and citation omitted). The Court further noted that the Department had actual knowledge of the respondent-parent's disability, as evidenced by the goals set forth in the PATP referencing the respondent-parent's "intellectual capacity," testimony at the preliminary hearing indicating that the respondent-parent had emotional and cognitive impairments, and the results of the psychological evaluation, which reflected that the respondent-parent had "cognitive defects and reported that she had an IQ of 70, within the borderline of intellectual functioning." *In re Hicks/Brown*, 500 Mich at 87-88 n 5. Similar evidence was presented regarding respondent's disability in the present case, such that the DHHS was obligated to provide appropriate accommodations. When uncontested evidence establishes that a respondent-parent has a disability, trial courts should err on the side of caution by ensuring that services are provided in accordance with *In re Hicks/Brown* and the ADA to accommodate that disability.

However, even if respondent is considered disabled under the ADA, she is required to specify what services would have accommodated her needs. *In re Sanborn*, 337 Mich App at 267. Respondent refused to undergo a psychological evaluation until January 2025, over six months after the case was initiated in April 2024. Lee had "referred and re-referred" respondent to new and existing services. After respondent's psychological evaluation, Lee referred respondent to specialized services at NSO and DWN, but respondent did not participate in those services. Respondent completed parenting classes successfully—indicating her ability to do so—and was offered one-on-one specialized classes after November 2024. "Repeated exposure" like this may be appropriate for someone in respondent's shoes. *In re Sanborn*, 337 Mich App at 265. However, she attended 6 of the 21 total sessions before the service was terminated because respondent could not be located. Like the respondent-mother in *In re Sanborn*, who became noncommunicative

---

[3] Individualized Education Program.

with her caseworker, respondent and Lee were not in regular contact after the November 2024 incident. Notably, Lee's efforts with respondent were described as "herculean," and respondent indicated Lee was "the best worker" she was assigned.

The extent of respondent's disability became evident in January 2025 when she completed the psychological evaluation. Respondent failed to successfully complete or benefit from her PATP, despite being offered personalized services before and after her diagnoses. Critically, respondent has not identified what alternative services would have accommodated her disability and enabled her to successfully complete the PATP, which she must do to establish a plain error affecting her substantial rights. *In re Sanborn*, 337 Mich App at 267.

In conclusion, respondent failed to avail herself of the many services, standard and specialized, she was offered throughout the proceedings. Specifically, respondent did not follow through with referrals to NSO, which is for individuals with disabilities, or for services through DWN. DHHS could not force respondent to take advantage of the services it offered *specifically* in response to her mental health diagnoses. The trial court noted respondent's refusal to comply with or benefit from services does not mean she has a disability and concluded *In re Hicks/Brown*, 500 Mich 79, does not apply. But DHHS's offer of specialized referrals demonstrated an attempt to accommodate respondent which was declined. Further, respondent cannot establish a violation because she did not specify services that would have allowed her to fare better. *In re Sanborn*, 337 Mich App at 264. Accordingly, respondent is not entitled to relief on this basis.

## B. STATUTORY GROUNDS

"We review for clear error the trial court's finding that there are statutory grounds for termination of a respondent's parental rights." *In re Atchley*, 341 Mich App at 338. "A decision qualifies as clearly erroneous when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.'" *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009), quoting *In re JK*, 468 Mich 202, 209-210; 661 NW2d 216 (2003). "If the trial court did not clearly err by finding one statutory ground existed, then that one ground is sufficient to affirm the termination of respondent's parental rights." *In re Sanborn*, 337 Mich App at 273.

Under MCL 712A.19b(3)(j), the trial court may terminate parental rights if "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id*. at 711. Emotional harm, as well as physical harm or abuse, can satisfy the statute. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011).

In *In re White*, 303 Mich App at 712, the respondent-mother regularly invited men with criminal backgrounds into her home throughout the proceedings, putting her children, in particular her autistic daughter, at risk of harm. This Court found the trial court's termination under MCL 712A.19b(3)(j) was supported by the evidence. *Id*. at 713. Similarly, the respondent-mother in *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012), had been "struggling with her anger-management problem for years," had received treatment for it at least twice, and still

could not control her anger. The respondent-mother was arrested for disturbing the peace after an altercation with a teacher and the police, and "the children were mimicking [her] behavior." *Id*. The trial court found the children were likely to be harmed if returned to the respondent-mother's care, and this Court affirmed. *Id*.

In the present case, respondent claims she completed a "solid portion of the service plan," has rectified the conditions that brought the children into the court's jurisdiction and has "never physically abused the children." Consequently, respondent argues, the trial court's finding that the children are likely to be harmed if returned to her care is not supported by clear and convincing evidence. The PATP included a psychological evaluation, individual counseling, family therapy if appropriate, infant mental health services, continued contact with the caseworker, acquisition of a legal source of income and suitable housing, and attendance at court, parenting time sessions, and medical appointments. Respondent was not compliant with the PATP at any point in the child protective proceedings: by the first dispositional review hearing, respondent contravened the trial court's order by having unsupervised parenting time. Respondent did not maintain housing or employment. Numerous referrals for individual therapy were terminated for various reasons, including respondent's verbal aggression. Respondent did not benefit from parenting classes and attended only 6 of 21 supplemental one-on-one classes ordered. Respondent failed to attend two scheduled psychological evaluations before the January 2025 psychological examination. As of the supplemental petition, family therapy had not been recommended. Respondent failed to attend 27 of 45 scheduled parenting time sessions and neglected to attend several court hearings. She further did not attend medical appointments. Respondent's failure to comply with PATP is evidence her minor children are at risk of harm if they are returned to her care. *In re White*, 303 Mich App at 711.

Further, like the respondent-mother in *In re Olive/Metts Minors*, 297 Mich App at 41, who struggled with anger management, respondent appears to be struggling with her mental health disorders since adolescence, with medication used as a form of treatment. Respondent presently refuses to take medication. She did not complete individual therapy, because "when [respondent] is confronted with the realities of herself, she becomes aggressive," and had done so with one of the therapists. In short, respondent failed to address her mental health concerns which not only placed her children at risk of harm but barred her progress. CJW's psychological evaluation indicated the presence of certain psychological concerns, and CJR was suspended several times during the school year for physically assaulting staff. CJR may already be "mimicking" respondent's behavior; CJW and CTH might also do so if left in her care. *Id*.

In sum, respondent failed to comply with her PATP, and this evidence supports the court's conclusion that termination of her parental rights was proper under MCL 712A.19b(3)(j). Respondent further refused to address her mental health ailments, and the minor children would be at risk of harm if returned to her care. Satisfaction of one statutory ground permits the court to proceed to a best-interest analysis. *In re Sanborn*, 337 Mich App at 273.

## C. BEST INTERESTS

Once the trial court has determined one or more statutory grounds for termination have been proven by clear and convincing evidence, it must assess whether, by a preponderance of the

evidence, termination is in the children's best interests. *In re White*, 303 Mich App at 713. A trial court's best-interest determination is reviewed for clear error. *Id.*

To determine the children's best interests, the court should weigh all available evidence and consider a wide variety of factors. *Id.* Factors relevant to this case include the parent-child bond, the children's need for permanency and stability, advantages of the caregivers' homes in relation to the parent's home, the possibility of adoption, the parent's parenting ability, the parent's compliance with their service plan, and the parent's history of attending parenting time. *Id.* at 713-714. Further, the trial court must "decide the best interests of each child individually." *In re Olive/Metts Minors*, 297 Mich App at 41.

Respondent asserts that her minor children are bonded to her. Lee testified all the children had a bond with their caregivers, and referred to them as "mom, mommy, [or] momma" and "Pop-Pop." The minor children recognize respondent but do not ask about her, reflecting the "sporadic" bond described by Lee. Notwithstanding the bond with respondent, the children's use of familial names for their caregivers indicates these individuals have taken over parental roles in the children's lives. Further, the caregivers provide safe homes that meet the children's individual needs. They also offer the stability and permanency of adoption. Contrary to respondent's claim that the caregivers want the children to be reunified with their mother, the caregivers indicated they prefer the stability of adoption to a guardianship *if* they were not returned home. And CJR's caregiver believed respondent "doesn't have any interest in the care and concern of [CJR]." He did not believe respondent would be accountable and participate in CJR's life, and "shared that [CJR] deserves permanency" as his reason for preferring adoption to guardianship. Initially, CJR's caregiver was willing to adopt all three children, but CJR was later placed independently because his behavior "became a bit much for the caregiver." CJR's needs are being met in his independent placement. Similarly, CJW and CTH remain together, enabling them to maintain a sibling bond, and their needs are being met. In sum, the caregivers are willing to provide stable, safe, adoptive homes because respondent has not demonstrated she is capable of properly caring for her children. These factors—bond, stability, possibility of adoption, and advantages of the caregivers' homes—favor termination of respondent's parental rights.

Throughout the proceedings, respondent has failed to comply with her PATP and attended less than half of the parenting time sessions. Specifically, respondent completed one round of parenting classes but failed to benefit from them, then attended only 6 of the 21 one-on-one parenting classes. As the trial court noted, respondent's behavior during the parenting time session in November 2024 was "central" to respondent's suitability and ability to provide proper care for the children. Respondent had nearly completed parenting classes on that date, but decided to drink alcohol, smoke marijuana, and use offensive language on a Facebook Live post with her children present, while "basically ignoring them." Respondent visited with her children unsupervised, contravening the court's order. She did not regularly attend educational or medical appointments. She failed to maintain suitable housing and a legal source of income. She never completed individual therapy. Throughout the proceedings, respondent has not demonstrated dedication to her children having failed to complete nearly every aspect of the PATP despite knowing its contents and provided the assistance of a "herculean" caseworker. Further, after the November 2024 incident, respondent disappeared from her children's lives for at least 108 days.

The record supports the court's determination that termination of respondent's parental rights was in the best interests of these children. The children are bonded with their caregivers, who provide stability and care and are willing to adopt, and respondent has not demonstrated strong parenting abilities or a desire to improve them.

Affirmed.

/s/ Daniel S. Korobkin
/s/ Adrienne N. Young
/s/ Mariam S. Bazzi